UNITED STATES of America, Appellee,

v.

Andrea AIELLO, a/k/a "Antonio Aiello", Francesca Bartolotta, Lorenzo Scaduto, Defendants-Appellants.

Nos. 84–1404, 84–1405 and 84–1413.

United States Court of Appeals, Second Circuit.

Argued March 25, 1985.

Decided Aug. 7, 1985.

Gerard E. Lynch, New York City (Fischetti, Feigus & Pomerantz, New York City, of counsel), for appellant Aiello.

Jeffrey A. Rabin, Brooklyn, N.Y., for appellant Bartolotta.

Anne C. Feigus, New York City (Ronald P. Fischetti, Mark F. Pomerantz, Warren L. Feldman, Fischetti, Feigus & Pomerantz, New York City, of counsel), for appellant Scaduto.

William J. Cunningham, III, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty. for the E.D. of N.Y., Mary

McGowan Davis, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before MANSFIELD, OAKES and WINTER, Circuit Judges.

MANSFIELD, Circuit Judge:

Andrea Aiello, Lorenzo Scaduto, and Francesca Bartolotta appeal judgments of conviction of narcotics violations after a ten week jury trial in the Eastern District of New York before Mark A. Costantino, *Judge.* Appellants raise various issues, the most important of which are challenges to the district court's evidentiary and suppression rulings and to the ruling that a third-party's approach to one juror did not require the declaration of a mistrial. We affirm, except as to the disposition of Scaduto's convictions on two lesser-included offenses.

In October 1982 Daniel Costa, a New York City undercover officer, initiated a relationship with a heroin dealer named Charles Salemi. In the course of several heroin purchases from Salemi Costa became acquainted with Salemi's various customers and colleagues in the drug trade. Costa eventually purchased heroin directly from Salemi's source, Sal Bartolotta. Costa also encountered Fillipo Ragusa, whom Costa believed to be the ringleader of the heroin operation. Surveillance and telephone wiretaps of Bartolotta's phone were conducted by the Queens County District Attorney pursuant to eavesdropping warrants issued by a justice of the New York State Supreme Court on March 30, 1983, and on May 13, 1983. They disclosed communications between these individuals, appellant Scaduto and others and coded narcotics transactions featuring the code word "tile" for heroin. Surveillance also uncovered communications between Scaduto and appellant Aiello, who established a tile importing business in 1983 with a warehouse in Buffalo, N.Y.

On September 15, 1983, government agents in Port Newark, N.J., intercepted a tile shipment from Italy to Aiello and found 18 kilograms of heroin in the centerboards of the shipping pallets. The agents replaced almost all of the heroin with harmless white powder and sent the consignment on to Aiello in Buffalo, under surveillance. That night the government applied for a court order authorizing entry into Aiello's Buffalo warehouse and the installation of a video camera. The government did not apply for permission to record sound and did not follow the procedures specified for electronic surveillance under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1982), which does not mention video surveillance. The order, issued on September 16, 1983, by Judge Elfvin in the Western District of New York, granted authorization for the videotaping on the basis of Fed.R.Cr.P. 41(b) and 57(b) and 28 U.S.C. § 1651, specifying that monitoring was to occur only when Aiello or other suspected conspirators were inside the premises.

On the arrival of the shipment at the warehouse agents at the scene observed the tiles being unloaded and noticed that some of the pallets were broken. On September 17 shots taken inside the warehouse revealed Aiello and a co-defendant working on the pallets and removing the five centerboards. Agents outside later observed Aiello loading the centerboards into a truck and driving them to the vicinity of his house, where they were transported into his house. None of the videotaped scenes, however, depict any of the defendants directly handling the packages of white powder. Later that day newly-installed centerboards were attached to the marble-laden pallets.

In the meantime Scaduto, having been advised by Aiello (using a public telephone) that the shipment had arrived, flew under the name "Frank Mineo" from New York City to Buffalo, where he was picked up by Aiello at the airport. Scaduto, in turn, also using public telephones, arranged with Salvatore Bartolotta in New York City to have Pietro Graffeo and Domenico Lo Galbo fly to Buffalo after Scaduto remarked that he would have difficulty bringing "those things down." On September 18 the video-

camera recorded Aiello and Scaduto inside the Buffalo warehouse examining the marble tile pallets. On September 19, after Scaduto made plane reservations for three persons under the name "Amare", he, Graffeo and Lo Galbo flew back to New York City.

Three days after the delivery of the tile shipment to Aiello, federal and state agents, with warrants, raided several locations and made a series of arrests and conducted searches. All three appellants were arrested during the roundup. A search of appellant Bartolotta's house turned up heroin, guns, narcotics paraphernalia and a notebook containing records of drug transactions. Although Ragusa escaped arrest, a search of his apartment uncovered heroin, firearms, cash, and narcotics paraphernalia. Searchers at Aiello's house and warehouse, however, could not locate the drugs, the white powder, or the centerboards of the pallets.

A seven count superseding indictment filed on October 20, 1983 charged 10 individuals with a variety of narcotics violations. Scaduto and Aiello were charged with conspiracy to import heroin and to distribute it, 21 U.S.C. §§ 846, 963, importing heroin, 21 U.S.C. §§ 952, 960, and managing a continuing criminal enterprise, 21 U.S.C. § 848. Scaduto was also charged with possession with intent to distribute heroin, 21 U.S.C. § 841. Appellant Bartolotta was charged with one count of conspiracy to possess heroin with intent to distribute, 21 U.S.C. § 846. Seven other defendants, including the still-fugitive Ragusa, were charged with a variety of narcotics offenses.

The defendants moved to exclude the evidence obtained through the wiretap of Salemi's phone on the ground that the state had not properly obtained an extension of the wiretap authorization from the New York State Supreme Court. As part of the motion the defense argued that the court authorization for videotaping at the warehouse was based in part on the fruits of the allegedly unlawful wiretap and that the videotape should accordingly also be excluded. Aside from this there was no motion to suppress the videotaped evidence on constitutional or other grounds. Pointing out that only defendant Bartolotta had standing to challenge the wiretap evidence, Judge Costantino denied the defense motion to suppress the fruits of the wiretap, *see United States v. Ragusa,* 586 F.Supp. 1256 (E.D.N.Y.1984). The defense also moved unsuccessfully to exclude other evidence, including the items confiscated during the search of appellant Bartolotta's house.

At trial, government witnesses testified to the above events and introduced the physical evidence seized, including 24 kilograms of heroin. The prosecution played excerpts from the wiretaps and videotapes for the jury and contended that the surveillance film showed Aiello unloading the heroin and later inspecting it with Scaduto. At the conclusion of the government's case, the judge granted a judgment of acquittal to one defendant, Rita Volpe.

The defense tried, during opening statements, the body of the trial, and summations, to establish that if the government had made sound recordings at the Aiello warehouse, the conversations there would have revealed that the defendants had simply unloaded the tile, were irate at the breakage en route, and had worked to repair the damaged pallets. The defense contended that the government agents had purposefully failed to record sound because they knew that a sound recording would exculpate the defendants. To bolster this argument, the defense introduced testimony that the warehouse could have been wired for sound, contrary to testimony by one government witness. The defense also showed the jury portions of the videotapes other than those played by the prosecution. Other defense witnesses challenged testimony by a government expert that the overheard conversations included coded references to drugs.

On the Sunday following the close of the defense case, one of the jurors (juror No. 1) received two anonymous phone calls asking for her by name and inquiring whether she

was serving on a jury. During the second call the man said he wanted her to help a friend of his but he did not name anyone. In both cases, she hung up. Upset and alarmed, she telephoned the FBI and described herself to duty officer Marilyn Luck as "terrified." On the officer's advice, she spent the evening elsewhere without incident. On the following morning, as she was leaving her home, she was approached by a man whose voice she identified as the one she had heard on the telephone the day before. When the man, in an accent that "might have been Italian," asked whether she was Natalie, the juror rolled up the window of her car and drove off to the courthouse. Upon arrival there, she met a fellow juror and proceeded with him to the judge's chambers where each spoke briefly and separately to the judge in the presence of the judge's law clerks. During one of the two conversations between the judge and juror No. 1, duty officer Luck was present.

Following these conversations, the judge apprised counsel of the incident. All defendants moved for a mistrial. The judge then held a plenary hearing. In the presence of counsel but without the defendants (whom the judge excluded because of any possible chilling effect on the jurors), the judge separately questioned each juror out of the presence of the others. All defendants objected to being excluded from the hearing. However, the defense was allowed to submit questions to be put to the jurors.

When questioned, juror No. 1 repeated her earlier account of the events. In response to questions she indicated that "I'm scared. I don't—I can't be positive if it has or hasn't [affected my impartiality]" and later "I could [be fair]—I think so." In an exchange with the judge, she indicated that sequestration would soothe her fears:

> "Juror: I'm having difficulty in being fair because I know I'm going to be going home tonight and I don't know what is going to happen tonight or when the phone rings.

> Judge: Suppose I tell you you are not going home tonight?

> Juror: I could say right now that I could be impartial because I'm sitting in a courtroom and I feel totally safe.

> Judge: All right. You'd be impartial. You could say that now. How about being fair?

> Juror: Yes."

Juror No. 1 did indicate that she had some fear about what might happen at the end of the trial but that she could be fair nonetheless. None of the other jurors indicated that they had been approached, nor did any but juror No. 2 know of the approaches made to juror No. 1. Juror No. 2 stated that he felt fully able to be fair and impartial.

The defendants then renewed their motion for a mistrial, which Judge Costantino denied. The judge instead ordered the jury sequestered and the trial proceeded. Judge Costantino gave the government two hours for summation plus twenty minutes for rebuttal and gave the defense a total of four hours, to be divided among the attorneys for the eight defendants. Scaduto's counsel objected unsuccessfully that the half hour allotted to him was inadequate.

The jury deliberated for four days and then returned a verdict that acquitted five defendants entirely and convicted the three appellants. Scaduto was convicted of conspiring to import heroin and to distribute it, of importing heroin, of possessing it with intent to distribute, and of managing a continuing criminal enterprise. Aiello was convicted of conspiracy to import and to distribute heroin and of importing it, but he was acquitted of managing a continuing criminal enterprise. Bartolotta was convicted of conspiring to possess heroin with intent to distribute.

At sentencing a few months later, Judge Costantino sentenced Aiello to a total of 26 years in prison, followed by a special parole term of 15 years and a total fine of $75,000. The judge sentenced Scaduto to (1) 35 years of imprisonment and a fine of $100,-000 on the count of managing a continuing criminal enterprise, (2) 14 years and fines

of $25,000 each on the counts for conspiracy to import and to distribute, these sentences to run concurrently with each other and consecutively to the 35 year sentence, and (3) 15 years imprisonment and $25,000 fines each on the two substantive counts, the sentences to run concurrently with each other and consecutive to those on the other counts. Appellant Bartolotta received a sentence of 5 years and a $7,500 fine.

Upon this appeal appellants raise eight issues, four of which warrant discussion: (1) the propriety of the extended wiretap of Salemi's phone, (2) the handling of the approach to juror No. 1, (3) the use of the videotaped evidence at the trial, and (4) the procedure for handling Scaduto's convictions on lesser-included counts.[1]

## DISCUSSION

### Admission of Evidence Derived from Wiretaps of Salemi's Phone

■ Defendant Bartolotta contends that the district court erred in not suppressing her conversations intercepted pursuant to state court authorizations for the tapping of Salemi's telephone. Specifically it is claimed, principally on the basis of state court decisions in *People v. Gallina*, 95 A.D.2d 336, 342, 466 N.Y.S.2d 414 (2d Dep't.1983) (*Gallina I*) and 104 A.D.2d 953, 480 N.Y.S.2d 570, 571–72 (2d Dep't. 1984) (*Gallina II*), that the state district attorney, by not applying for an extension of the first court-authorized Salemi wiretap until after the expiration of the eavesdropping warrant, violated N.Y.Crim. Proc.Law § 700.40, which provides that "[a]t any time prior to the expiration of an eavesdropping warrant, the applicant may ... apply for an order of extension." In addition, Bartolotta claims that the state violated N.Y.Crim.Proc.Law § 700.35, which states that "[u]pon termination of the authorization in the warrant, eaves-

dropping must cease and any device installed for that purpose must be removed or permanently inactivated as soon as practicable." In resolving these contentions we are governed by our own decisions to the effect that, although federal law normally controls the admissibility of evidence in federal criminal trials, we will apply more stringent state statutory requirements with respect to wiretap authorizations that are designed to protect an individual's right of privacy. However, when the more stringent requirements result from new state court interpretations of state laws governing evidence-gathering, and when the state officer, prior thereto, relies in good faith on pre-existing less stringent state court interpretations, we will not apply the new interpretations retroactively, at least when to do so would not serve the interests of justice. *United States v. Sotomayor*, 592 F.2d 1219, 1223, 1226 (2d Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979); *United States v. Marion*, 535 F.2d 697, 702 (2d Cir.1976); *United States v. Manfredi*, 488 F.2d 588, 592 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *see also United States v. Peltier*, 422 U.S. 531, 537, 95 S.Ct. 2313, 2317, 45 L.Ed.2d 374 (1975); *Linkletter v. Walker*, 381 U.S. 618, 636–40, 85 S.Ct. 1731, 1741–44, 14 L.Ed.2d 601 (1965).

Were it not for the state court decisions in *Gallina I* and *II, supra*, we would have no hesitancy in ruling that the state district attorney's failure to apply for an extension or reactivation of the Salemi wiretap until after the expiration of the first 30-day warrant did not violate § 700.40 since that statute is permissive, using the word "may", rather than mandatory. Nothing on the face of § 700.40, even when read with § 700.35, prohibits a state law enforcement agency, following the termination of a wiretap authorization, from seeking a second eavesdropping order. Indeed, in 1977 the N.Y. State Supreme Court, Second De-

---

1. The remaining four arguments are: (1) that a ledger recording heroin transactions was improperly admitted as a co-conspirator's statement; (2) that the proof was insufficient to support Scaduto's conviction for managing a continuing criminal enterprise; (3) that summation time was improperly limited; and (4) that the warrant for the search of appellant Bartolotta's house was defective. We find no merit in any of these contentions.

partment, emphasized that the purpose of the § 700.40 provision authorizing police to apply for an extension prior to the expiration of an eavesdropping warrant was to avoid burdening the police with the task of removing eavesdropping equipment upon the termination of a warrant when an application for an extension was pending. *People v. Glasser*, 58 A.D.2d 448, 451, 396 N.Y.S.2d 422, 424 (2d Dep't.1977).

Nor do we view *Gallina I* as prohibiting an extension order from being obtained unless it is applied for prior to termination of the earlier order. *Gallina I* simply held that a "temporary deactivation" of eavesdropping equipment during an unexplained six-day gap between the expiration of the first order and the issuance of the second did not satisfy § 700.35. As we hold below (pp. 628–629) the district court's finding in the present case that the eavesdropping device was permanently inactivated as soon as possible after termination of the first order is supported by the record and not clearly erroneous. Moreover, the reason for the 14-day delay before application was made for the reactivation of the wiretap was fully explained; this period was needed to enable the police to translate into English and transcribe the Sicilian conversations intercepted during Salemi No. 1, so that the results could be disclosed to the court as required by § 700.40. Although it is true that *Gallina II* implied that an extension order may not be obtained after the original authorization expires, it did not squarely so hold. The most that can be said is that New York law on that issue remains uncertain and unresolved.

■ In any event, even if the *Gallina* decisions were interpreted as Bartolotta urges, they would not necessarily govern the state officers' conduct in the present case since they post-dated the state court Salemi wiretap authorization and therefore could only apply if those decisions were given retroactive effect. In such circumstances it may be presumed that the state law enforcement agencies in the present case acted in good faith reliance on state law as it had been interpreted at the time

when the court wiretap authorizations were sought, *see People v. Glasser, supra,* and since retroactive application would not further any interest of justice we decline, in accordance with our decision in *Sotomayor,* to give retroactive application to the *Gallina* decisions as so interpreted.

■ The second issue, whether the eavesdropping device authorized by the first state court order was "removed or permanently inactivated as soon as practicable" in accordance with § 700.35, challenges the district court's finding with respect to a factual question and therefore requires Bartolotta to assume the burden of showing that the district court's finding (*United States v. Ragusa*, 586 F.Supp. 1256 (E.D.N.Y.1984)) was clearly erroneous or the product of an abuse of discretion. No such showing has been made. On the contrary the record clearly supports Judge Costantino's finding that the Salemi No. 1 eavesdropping device was permanently inactivated within the meaning of § 700.35. The wiretap was first installed pursuant to a warrant obtained by the Queens District Attorney's office from the state court on March 30, 1983. The tap was effected through a connection between the two wires servicing Salemi's phone and a second pair hooked up to a "friendly" phone number: by dialing the friendly number, agents could listen to calls on Salemi's line. Agents dialed the friendly number from a phone ("slave phone") at an apartment used for the surveillance. To the slave phone they attached a pen register and tape recorder. When a call was made from the Salemi number the tape recorder would be activated and the pen register would list out the phone number being called. The agents could listen to calls using ear phones or over a speaker in the tape recorder. The pen register, which itself did not record conversations but only the time when the Salemi phone was taken off the hook, the telephone number dialed, and the time when the receiver was placed back on the hook, did not require court authorization. *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *United*

*States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); *People v. Meticheccia,* 91 Misc.2d 129, 397 N.Y.S.2d 514 (S.Ct.App.Term 1977).

When the wiretap order expired on April 29, 1983, the police, who had not yet applied for an extension order, took steps to deactivate the tap. The agent in charge took the tape out of the recorder, hung up the slave phone, and unplugged the tape recorder. At some point, the tape recorder was detached from the slave phone. By taking these steps the police lost the capacity to monitor conversations over the Salemi phone. Further steps to deactivate the wiretap could not be taken without also losing the ability to use the pen register to record the numbers called from the Salemi phone, which the police had the right to do without a warrant. The record thus fully supports the district court's finding that the police had satisfied the requirements of § 700.35. See *United States v. Ragusa, supra,* 586 F.Supp. at 1258–60.

*The Approach to Juror Number One*

■ Appellants argue that the unidentified third party's communications with juror No. 1 warranted a mistrial, particularly in view of the district court's handling of the matter. They maintain that the trial judge's actions, especially his *ex parte* discussions with the two affected jurors, deprived the defendants of a fair trial and that his finding that the jury had not been tainted was clearly erroneous. We disagree. The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation," *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983) (per curiam) (*quoting Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982)).

■ Upon learning of an unauthorized communication by a third person with a juror about a case pending before the juror, the judge must investigate the matter to determine whether the juror's ability to perform her duty impartially has been adversely affected. The extent of that investigation and the method of conducting it will, of course, depend on the surrounding circumstances, including the content of the communication and the apparent sensitivity of the juror. The trial judge must be given wide discretion to decide upon the appropriate course to take, in view of his personal observations of the jurors and parties. *See United States v. Phillips,* 664 F.2d 971, 998–99 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Bufalino,* 576 F.2d 446, 451–52 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). He may choose to make an immediate inquiry of the juror in open court. But circumstances may caution against that course, such as when the mere knowledge of the existence of the approach to one juror might adversely affect other jurors, or when questioning of the juror before others might have a chilling or embarassing effect on the juror who has been approached by the third party. In the latter instances the trial judge, aided by his personal observation and appraisal of all persons concerned, may choose a private inquiry in the more relaxed atmosphere of the robing room. *See United States v. Gagnon,* — U.S. —, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam); *Rushen v. Spain, supra.* However, caution dictates that the interrogation and answers be simultaneously recorded, preferably in the presence of counsel for the parties. Unless the communication with the juror is patently innocuous, the judge, before ruling on a motion for a mistrial, would be well advised to hold a *voir dire* hearing. As the Supreme Court stated in *Remmer v. United States,* 347 U.S. 227, 229–30, 74 S.Ct. 450, 451–52, 98 L.Ed. 654 (1954), "[t]he trial court should not decide and take final action *ex parte* [on information that a third party has contacted a juror], but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."

■ Applying these principles, we conclude that Judge Costantino erred in not

having made a simultaneous verbatim record of his initial private inquiries of jurors No. 1 and No. 2. It would also have been preferable to have had counsel present at that inquiry. However, without condoning these procedural omissions we are satisfied that in this case the error was harmless, for the reason that immediately following his initial private questioning of the two jurors he apparently recognized that the third person's approach was not patently inconsequential and advised counsel of the substance of what had transpired. Thereupon Judge Costantino held a plenary hearing, in which defendants' lawyers fully participated and in which he examined each of the 12 jurors separately. When these examinations were completed, and with the defendants then present, counsel for both sides addressed the issues raised at the hearing. At the end of the hearing Judge Costantino denied defendants' motion for a mistrial but ordered the jury sequestered for the remainder of the trial. In the circumstances of this case we cannot say that these procedures were inadequate to ensure that defendants were not deprived of their right to a fair trial. The record fails to support appellants' contention that in so ruling Judge Costantino was motivated by a desire to avoid a second trial rather than by his conclusion that juror Nos. 1 and 2 could continue to act impartially regardless of the attempt by the anonymous third person to communicate with juror No. 1.

We also find that it was within the district judge's discretion to conclude that the potential chilling effect on the openness and candor of the jurors' responses to questions about their reactions to the third party communications justified his excluding the defendants from the *voir dire* part of the hearing. *Cf. United States v. Gagnon, supra,* — U.S. at —, 105 S.Ct. at 1485 (Fifth Amendment does not require defendants' presence during brief meeting between judge and juror over minor incident); *United States v. Williams,* 737 F.2d 594, 612 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985) (finding it permissible that counsel

merely received a transcript of the judge's inquiries to jurors exposed to third party); *United States v. Buchanan,* 633 F.2d 423, 427 (5th Cir.), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1981) (only court reporter and law clerks present during juror interviews).

The district court's finding, after a hearing, that no prejudice had occurred from the third party contact and that the jury remained able to render an impartial verdict is entitled to deference. *See, e.g., Patton v. Yount,* — U.S. —, 104 S.Ct. 2885, 2892 n. 12, 81 L.Ed.2d 847 (1984) (district court's finding of fact on whether juror should be disqualified may be set aside only for "manifest error"); *Rushen v. Spain, supra,* 104 S.Ct. at 456 (trial court's factual finding that jury's deliberations were not biased deserves a "high measure of deference"); *United States v. Bufalino, supra,* 576 F.2d at 451 (district court's finding on jury prejudice issue entitled to deference). The finding in this case was clearly reasonable.

No threats had been made to jurors nor had any names of defendants been mentioned, and the jurors, once sequestered, could be assured of their safety. Juror No. 1's statements indicated that she did not believe that her ability to act fairly with respect to any of the defendants had been compromised by the third party communication. *Cf. Smith v. Phillips, supra,* 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7 (*quoting Dennis v. United States,* 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950)) (" '[O]ne who is trying as an honest man to live up to the sanctity of his oath [as a juror] is well qualified to say whether he has an unbiased mind in a certain matter.' "). In response to the judge's final question whether she could "sit fairly and impartially on this jury and come to a conclusion?" she answered "I think so." At other points during the *voir dire,* she gave unequivocal answers to questions the judge posed about her capacity to act fairly, impartially, and without bias or prejudice.

The accuracy of the district judge's finding about the ability of the jury to render an impartial verdict is confirmed by the care which the jury took in its deliberations; over a period of four days it requested multiple readbacks of testimony and then determined that some defendants should be acquitted altogether, that others should be acquitted on some charges, and that others were guilty of all crimes charged. Given the jurors' ignorance of the identity of the anonymous third person who approached juror No. 1 and which defendant, if any, that person represented, the jury's careful discrimination in weighing the evidence with respect to each defendant indicates strongly that it was not influenced by the third person's communications with juror No. 1.

*The Admission of the Videotaped Evidence ·*

■ Although appellants did not at trial object on constitutional grounds to the admission of videotapes of the activity in the warehouse, they now urge us *sua sponte* to rule under Fed.R.Crim.P. 52(b) that the admission of this evidence was "plain error" because it may have exceeded the district court's authority and have violated the Fourth Amendment. We decline the invitation for the reason that, by failing to raise the issue at trial, which might have provided us with an adequate record for review, appellants clearly waived their right to have the issue reviewed. It is our policy that "[w]here ... a defendant at trial deliberately waives or bypasses an attack upon the voluntariness of a confession, including affirmative use of it in an effort to exculpate himself, he should not be permitted to change his position on appeal, absent a showing of new circumstances unknown to him at the time of trial." *United States ex rel. Terry v. Henderson,* 462 F.2d 1125, 1130 (2d Cir.1972).

■ We disagree with appellants' present contention that the objections voiced by them in the district court were adequate to enable us on appeal to rule on the constitutional issue now raised for the first time. Aiello's pretrial motion to suppress evidence was based solely on the contention that the September 16th videotape order was tainted because it was obtained mainly in reliance on the allegedly defective wiretap order, and not on any claim that the videotape evidence was itself inherently unlawful. More important, the district court properly upheld the validity of the wiretap order, thus eliminating the alleged defect in the videotape evidence. Faced with the admission of the wiretaps, appellants' trial strategy was no longer to seek exclusion of the videotapes but to argue that the government's failure to wire the warehouse for sound demonstrated that the warehouse conversations were innocent and that the government was acting in bad faith. Indeed, appellants so argued in their openings.

Defendants' two passing attempts at trial to have the videotape material excluded involved only evidentiary, not constitutional, objections: counsel for Aiello contended that because of the absence of sound recording the prejudicial impact of the videotapes exceeded their probative value, while counsel for Scaduto argued that an inadequate foundation had been laid for their admission. These objections, which occupy fewer than 5 pages in a transcript of more than 5,000 pages, hardly suggest that defendants were seriously concerned by the possibility that admission of the videotapes would violate their constitutional rights.

Even were we to find that appellants had not deliberately failed to press their objection to the admission of the videotapes, other factors we cited as relevant in *United States ex rel. Terry v. Henderson, supra,* would justify our not exercising the discretion that Fed.R.Crim.P. 52(b) confers upon us. As in *Terry,* appellants here made "affirmative use of [the videotapes] in an effort to exculpate [themselves]." *Id.* at 1130. Their claim of substantial prejudice from the admission of the allegedly illegally obtained videotapes is thus seriously compromised. We note in this regard that three of the five people shown in the videotape films were acquitted of all charges.

632

A *sua sponte* appellate ruling in this case on the constitutionality of a non-audio videotape order would be inappropriate for still another reason—the inadequacy of the record. Since no pre-trial motions directly relating to the videotapes were made, the video order, application and supporting affidavits were never filed with the district court. While the parties have sought to remedy this deficiency by agreeing to a "Stipulation to Expand the Record," they have—since oral argument—continued to submit papers showing disagreement over such important issues as whether the Department of Justice authorized the United States Attorney for the Western District of New York to apply for a court order authorizing the installation of the video camera inside the Aiello warehouse. In the absence of the kind of record that would have been developed had appellants raised their constitutional claim below, we decline to consider that claim when raised for the first time on appeal.[2]

*Scaduto's Lesser-Included Offenses*

As the government concedes, there was error in preserving appellant Scaduto's separate convictions on two lesser-included conspiracy counts and in sentencing him on those counts in addition to his sentence for managing a continuing criminal enterprise.[3] Although we recently set out the proper course of action for handling convictions on such lesser-included offenses, *see United States v. Osorio Estrada,* 751 F.2d 128, 134–35 (2d Cir.1984), *modified on reh'g on*

*other grounds,* 757 F.2d 27 (2d Cir.1985), the issue requires renewed attention in view of the Supreme Court's decision in *Ball v. United States,* — U.S. —, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985). *See United States v. Borello,* 766 F.2d 46, 54 n. 18 (2d Cir.1985) (stating that "we wait for another day to decide whether *Ball* overrules *Osorio Estrada* ").

In *Osorio Estrada* we reconciled conflicting Second Circuit precedents,[4] by holding that when a defendant is convicted of an offense and of lesser-included offenses, the proper course of action is to "combine" the "convictions on the lesser offenses ... with the conviction on the greater offense," *United States v. Osorio Estrada, supra,* 751 F.2d at 135, so that the convictions for the lesser offenses would cease to exist unless the conviction for the greater offense should be reversed, in which event the defendant could be punished for the lesser offenses. We explained that:

"Under this method, the convictions on the lesser counts become combined with that on the compound offense and would *not* be merged out of existence.

This leaves the part of the conviction on the lesser offense unaffected should the compound offense be invalidated as a matter of law. The convictions on the lesser offenses would not exist as separate convictions so long as the § 848 conviction remained in place. Thus the risk of any collateral consequences that separate convictions may entail would be

2. The two factors from *United States ex rel. Terry, supra,* just considered, serve to distinguish this case from *United States v. Tortorello,* 480 F.2d 764 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). In *Tortorello,* defendants had made no affirmative use of the wiretap material. In addition, even though the Court considered only the facial constitutionality of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, it did so against the background of an extensive post-trial evidentiary hearing on the wiretap issue, at which the procedures involved in obtaining the wiretap order were described and the district court considered affidavits offering grounds for issuance of that order. *See United States v. Tortorello,* 342 F.Supp. 1029 (S.D.N.Y.1972) (denying motion to suppress evidence after extensive evidentiary hearing).

3. *See United States v. Young,* 745 F.2d 733, 748–50 (2d Cir.1984) (holding that § 846 conspiracy offenses are lesser included offenses within a charge of managing a continuing criminal enterprise in violation of § 848), *cert. denied,* — U.S. —, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

4. In some cases, the Circuit had vacated appellant's conviction for a lesser-included offense, *see, e.g., United States v. Rosenthal,* 454 F.2d 1252, 1255 & n. 2 (2d Cir.), *cert. denied,* 406 U.S. 931, 92 S.Ct. 1801, 32 L.Ed.2d 134 (1972). In others, we had merely vacated the sentence on the lesser-included offense. *See, e.g., United States v. Mourad,* 729 F.2d 195, 202 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985).

eliminated and satisfy the concern expressed in *Rosenthal* ... that a defendant not be prejudiced by outstanding separate convictions on lesser included offenses." *Id.*

Judge Kearse wrote separately to say that she deemed it appropriate for the court to "vacate the convictions on the two lesser-included offenses, on the condition that the convictions on those offenses would be reinstated in the event that the conviction on the greater offense ... were ever overturned." *Id.* at 135. Nevertheless, she "concur[red] in the judgment in the hope that its import is that the convictions on the lesser-included offenses have ceased, in light of the conviction on the greater offense, to be a basis upon which collateral consequences, such as more severe parole treatment, may follow." *Id.*

A few months later the Supreme Court decided *Ball v. United States, supra,* which held that a defendant could not separately be punished for violating both 18 U.S.C. § 922(h)(1) (1982) (prohibiting the receipt of a firearm by a convicted felon) and 18 U.S.C.App. § 1202(a) (1982) (prohibiting a convicted felon from, *inter alia,* possessing a firearm in commerce), based on his handling of one gun on one occasion.[5] Having determined that Congress did not intend to impose duplicate punishment for the same conduct, the Court held that, although the jury could properly consider both sets of charges, "the District Judge should enter judgment on only one of the statutory offenses." 105 S.Ct. at 1674. As for Ball, who had received concurrent sentences on the two counts, the Court stated that

"the only remedy consistent with the congressional intent is for the district court, where the sentencing responsibility resides, to exercise its discretion to vacate one of the underlying convictions.... One of the convictions, as well as its

concurrent sentence, is unauthorized punishment for a separate offense. *See Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983).

"The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence. The separate *conviction,* apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction.... Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment." *Id.*

As we recognized in *Borello,* there appears to be some inconsistency between the Supreme Court's statement in *Ball* that the District Court must vacate one of the two convictions and the approach in *Osorio Estrada* of combining the two convictions. However, we recognize that the *"Ball* Court did not address the issue explored in *Osorio Estrada,* namely the subsequent vacation on collateral attack of the count on which judgment had been imposed." *United States v. Borello, supra,* at 54 n. 18.

The Supreme Court's objective in *Ball,* to avoid the punitive consequences that might follow from having dual convictions on a defendant's record, is achieved by the procedure adopted by us in *Osorio Estrada* of "combining" convictions to "eliminate" the "risk of any collateral consequences that separate convictions may entail." 751 F.2d at 135. A combined lesser conviction could

---

5. Although the Court did not use the term lesser-included offense, we noted in dicta in *United States v. Borello, supra,* at 54 n. 18, that the *Ball* case "appears to fall within a lesser-included context." The court charging a violation of § 922(h)(1) is a lesser-included offense of the count charging a violation of § 1202(a) in that "proof of receipt of a firearm *necessarily* includes proof of illegal possession of that weapon," 105 S.Ct. at 1672, although "the converse may not be true," *id.* n. 9.

not properly be considered, for instance, in determining a defendant's eligibility for parole, in sentencing him in the future under a recidivist statute or in impeaching his credibility at a later trial. However, should the defendant's conviction of the greater offense be reversed, an issue not before the Supreme Court in *Ball*, our procedure would resuscitate the lesser conviction and permit punishment for the lesser crime. The consequence is the same as if the lesser conviction had been vacated on condition that it might be revived only upon reversal of the greater one.[6]

We believe that the procedure followed by us in *Osorio Estrada* is consistent with the Court's decision in *Ball* and observes its prohibitions. As the Supreme Court has recognized, it is plainly consistent with congressional intent that a defendant found by a jury to be guilty of both crimes be punished for one or the other.[7] Were punishment for the greater charge somehow precluded, whether at the time of trial or thereafter, we cannot conceive that congressional intent is in any way disserved or hindered by allowing punishment for the lesser. Rather, the reactivation of the lesser conviction facilitates the congressional purpose of ensuring that a defendant is punished for whatever degree of a crime he is adjudged to be guilty of having committed. If the conviction on the greater offense is reversed, it is thus appropriate that the defendant duly receive punishment

for the lesser.[8] (*Cf. United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *McClain v. United States*, 676 F.2d 915, 917 (2d Cir.1982), *cert. denied*, 459 U.S. 879, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982). Any time already served would be counted as credit against the newly imposed sentence. In effect, the situation at this point would be virtually the same as if the jury had convicted on the lesser offense rather than on the greater. If the government were able to retry the defendant on the greater charge and chose to do so, any conviction on the greater offense would again replace the conviction on the lesser, requiring that the sentence on the lesser be vacated and the two convictions once again combined.

For the foregoing reasons we find no ground for departing from the procedure we described in *Osorio Estrada* for handling convictions for lesser and greater offenses, which accords with the Supreme Court's decision in *Ball*. We therefore vacate appellant Scaduto's sentences for conspiracy to import heroin, conspiracy to distribute heroin, and conspiracy to manage a continuing criminal enterprise, and we remand for the purpose of combining the convictions on the lesser counts with that on the greater and for resentencing. We stress that the fact of Scaduto's having been convicted on the lesser included charges is to have no collateral effect of any kind unless his conviction on the con-

6. Since the "convictions on the lesser offenses would not exist as separate convictions so long as the [conviction on the greater offense] remained in place," *United States v. Osorio Estrada*, 751 F.2d at 135, we conclude that there is no practical difference between the Supreme Court's prescription to vacate a conviction and our practice of "combining" a lesser conviction into a conviction on a greater offense, *except* that if the conviction on the greater offense were eventually to be overturned, our practice would, by design, resuscitate the lesser conviction and thereby ensure that the defendant would not avoid punishment for the lesser crime. We do not believe that the potential to reactivate a conviction in this way creates impermissible cumulative punishments.

7. When one crime is a lesser-included offense of another, cumulative punishment is disallowed

when a defendant is convicted of both for the reason that Congress did not intend to impose punishment for both crimes. *Cf. Missouri v. Hunter*, 459 U.S. 359, 368–69, 103 S.Ct. 673, 679–80, 74 L.Ed.2d 535 (1983) (two statutes punishing the same acts); *Whalen v. United States*, 445 U.S. 684, 691–92, 100 S.Ct. 1432, 1437–38, 63 L.Ed.2d 715 (1980); *see also Ball v. United States*, 105 S.Ct. at 1671–72. The defendant may be charged with both crimes, *id.* at 1674, and could be convicted of either (or both).

8. Naturally, the lesser conviction would only reactivate if the error that produced the reversal of the conviction on the greater offense was not one that also tainted the conviction on the lesser offense. Sentencing on the lesser offense would occur following the reversal of the conviction on the greater offense.

tinuing criminal enterprise charge should be overturned.

We have considered the remaining arguments raised by appellants and find each of them to be without merit. The judgments of the district court are affirmed except as to appellant Scaduto, whose judgment is vacated and remanded for the purpose of combining the convictions and resentencing.