**UNITED STATES of America,
Appellee,**

v.

**John Kent SMITH, Appellant.**

**No. 9545.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 4, 1965.

Decided Feb. 26, 1965.

Certiorari Denied May 17, 1965.
See 85 S.Ct. 1535.

John R. Hargrove and Benjamin L. Brown, Baltimore, Md. (Howard & Hargrove, Baltimore, Md., on brief), for appellant.

Robert W. Kernan, First Asst. U. S. Atty. (Thomas J. Kenney, U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, J. SPENCER BELL, Circuit Judge, and HUTCHESON, District Judge.

J. SPENCER BELL, Circuit Judge.

The defendant was convicted of aiding and abetting a Maryland bank robbery and a violation of the Dyer Act. The Government's contention was that the defendant participated in the theft of two cars in Washington, D. C., which he knew were to be used and which were used in the robbery and in transporting the robbers to and from Washington.

The defendant contends that the court committed two errors during his trial. The first was in permitting the witness Chappell to plead the Fifth Amendment, and the second was in limiting the cross-examination of the witness Goody.

On July 8, 1963, a branch of the Citizens Bank of Maryland at Oxon Hill was robbed at gunpoint by four persons of over $130,000.00. Eleven persons were indicted and charged with participating in one way or another in the robbery. The Government's case against the defendant consisted entirely of the testimony of four of his codefendants who had previously pleaded guilty to one or more of the six counts of the indictment. These witnesses were Sims, Ugaro, Chappell, and Goody. The other testimony did not directly implicate the defendant, since it dealt with proof of the robbery.

The Government concedes that the defendant was not present when the bank was robbed. There was also evidence of the loss and recovery of the stolen cars. Sims, who organized this robbery, was the accepted leader of a gang of bank robbers located in the New York-New Jersey area to which the other three witnesses belonged. All four had participated in other bank robberies in that area at various times prior to the one with which we are presently concerned.

On two occasions, June 24 and July 1, the group came from New York to Washington, where they made contact with local confederates[1] for the purpose of committing the robbery, but for various reasons they were frustrated until the successful attempt on July 8, 1963. The witness Sims took the stand and testified in detail to all the facts surrounding the crime. He testified that in the two frustrated attempts he had arranged for Chappell to come with them from New York and steal the desired cars in the Washington area. He testified that in making the preliminary arrangements, he had not gone into details with Chappell, who was a "specialist" in this field, because Chappell had worked with him before and could be relied on to do the job satisfactorily.

Chappell then took the stand and generally confirmed Sims' testimony concerning the facts related to robbery involved in this case. He testified that he had met the defendant Smith on prior visits to Washington and that he knew that Smith was in the business of "repossessing" automobiles and had a set of master keys which would unlock any General Motors car. He stated that on the second unsuccessful effort to rob the bank, he had borrowed Smith's keys in order to get the required vehicles and that Smith knew that the keys would be used to steal cars. He testified that after the second thwarted attempt, he became apprehensive and 'declined to participate further in the Maryland robbery, but

---

1. The evidence indicates that it was not until after the June 24 activities that the group, acting through Chappell, made any contact with the defendant.

before he did so, he arranged for the defendant Smith to take over for him and obtain the needed cars. He admitted that he had pleaded guilty to a charge of conspiracy to commit this bank robbery and that he was on probation because of a conviction for possessing counterfeit money.[2] On cross-examination Chappell was asked whether he had engaged in any other crimes with his codefendant Sims. After a conference at the bench, the court permitted Chappell to plead the Fifth Amendment to this question. It is this action on the court's part that the appellant contends was error.

■ We find no error. The witness Chappell was under indictment with Sims for bank robbery in New York, and certainly there is no question of his right to plead the Fifth Amendment. Nor is there any substance to the appellant's contention that Sims' testimony, which seriously implicated Chappell, removed the cloak of the Amendment's protection from Chappell. At most Smith was entitled to have Chappell's direct testimony implicating him expunged from the record if the Fifth Amendment plea in any way seriously hampered or embarrassed the defendant's effort to get at the truth of the facts in this case by his cross-examination of Chappell. Smith v. United States, 331 F.2d 265, 277–278 (8 Cir. 1964); United States v. Cardillo, 316 F.2d 606, 611 (2 Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). We need not go so far as Cardillo to say that if the question affected only the credibility of the witness, the refusal to answer would not entitle the defendant to have the witness' testimony stricken. Here we think it obvious beyond any possibility of a doubt that Chappell's character had been placed in such a light by his own prior testimony and by that of Sims that his plea of the Fifth Amendment could have had no other effect on the jury than to confirm the opinion created by his and Sims' prior testimony. Under these circumstances, it is equally obvious that Chappell's refusal to answer could not have embarrassed the defendant's efforts to elicit the full facts about the instant case.

■ We turn then to the second point raised by the defendant. When the robbers arrived in Washington in preparation for their third attempt, as a result of Chappell's previous arrangements, they went directly to the defendant's apartment, where they stayed during the weekend before the robbery. During the early hours of the morning of July 8, the defendant drove Goody and another member of the gang, both of whom were narcotics users, around the city in search of narcotics. Goody testified that it was during this ride that the defendant learned from the conversation that the robbery was to take place in Maryland. Upon their return to the defendant's apartment, a careful rehearsal of the crime was carried out in the defendant's presence. The three witnesses—Sims, Ugaro, and Goody—identified the defendant in the courtroom and testified to his presence at this rehearsal.

On direct examination Goody, who had joined the gang only on the last attempt and for whom principally the rehearsal in the defendant's apartment was put on, testified that he too first learned that the bank to be robbed was situated in Maryland on the automobile ride with the defendant early on the morning of the day of the robbery. On cross-examination defense counsel attempted to impeach Goody's testimony that the defendant had learned of the interstate character of their activities on the morning ride by showing that in a statement he had given in April, 1963, he had told the F.B.I. that he could not say specifically that Smith knew that the offense was to be committed in Maryland. Goody testified that he was not sure whether or not he had told the F.B.I. of Smith's knowledge of the locus of the crime. On re-direct it was shown that

2. Chappell was also under indictment for a robbery of the Bensonhurst National Bank in Brooklyn, New York on December 31, 1962.

Goody had given the information about the incident in the car to co-counsel for the Government about a week before the trial. On re-cross, Goody was asked why he had not mentioned the incident before, and the court pointed out that on his cross-examination the witness had said he could not remember whether he had or not. He was then asked if he had been questioned about the defendant prior to the April disclosure, and he conceded that he had. At this point in the re-cross, the following exchange occurred:

"Q. And you didn't tell anyone of the persons who questioned you about this incident in the car?

"A. I refused to talk about Mr. Smith at any other time.

"Q. You say you did refuse to talk about Mr. Smith?

"A. At any other time.

"Q. Is that correct? You are positive of that?

"A. Yes.

"Q. You didn't talk to him the first time you were arrested about Mr. Smith?

"A. I believe that statement was suppressed, wasn't it, Your Honor?"

The statement to which the question referred had been given by Goody in October, 1963, at the time of his arrest. It had been suppressed because of the illegality of the arrest. Goody had also contended that the statement had been coerced by an offer of narcotics to alleviate withdrawal symptoms from which he was suffering, but the court had not found it necessary to pass on this point.

The court refused to allow defendant's counsel to cross-examine on the statement. This refusal is defendant's basis for his second contention of error. An examination of the statement itself shows that in very general language and without giving details, it admitted Goody's part in the robbery and named the defendant Smith as one of the participants. While we have some doubt that the court would have been justified in denying the defendant the right to cross-examine on the basis of this statement solely because it had been suppressed, we think the court was clearly justified in declining in the exercise of its discretion to allow the cross-examination to proceed further along this line. While it is true that the statement would literally have refuted Goody's testimony that he had "refused to talk about the defendant Smith," it in no realistic sense refuted the substance of the witness' contention that he had not at any previous time told anyone that the defendant Smith knew the locale of the robbery. Furthermore, Goody prior to this question, had admitted on cross-examination that he had talked about Smith on occasion before his statement to Government counsel just a week before the trial. The trial court pointed out that the conflict was relatively unimportant with respect to Goody's credibility because he had both (1) admitted that he might have discussed Smith's implication and (2) conceded that he did not with certainty remember whether he had mentioned the automobile ride or not. The court also pointed out that to permit the use of the suppressed statement for this purpose would require permission to the Government to re-establish Goody's credibility by showing the circumstances surrounding the October statement and that to do so would take the inquiry too far afield. We think the court was within its discretion in thus limiting the cross-examination. Cf. Chinn v. United States, 228 F.2d 151, 154 (4 Cir. 1955).

There being no error, the judgment of the district court is

Affirmed.