**UNITED STATES of America**

v.

**Ennis Maurice FANT, Larry Blanding, and Benjamin J. Gordon, Jr., Defendants.**

**Crim. No. 90–434.**

United States District Court, D. South Carolina, Columbia Division.

Aug. 7, 1991.

258

E. Bart Daniel, U.S. Atty., John M. Barton, Asst. U.S. Atty., Columbia, S.C., for the U.S.

Daniel E. Martin, Sr., Charleston, S.C., for Blanding.

Lionel S. Lofton, Charleston, S.C., for Gordon.

## ORDER

HAWKINS, Chief Judge.

This matter is before the court on the motions of the defendants for judgment of acquittal, or in the alternative, for a new trial.

## FACTS

On March 8, 1991, a jury convicted Benjamin Gordon on two counts of Hobbs Act violations and Larry Blanding on three counts of Hobbs Act violations in connection with what has become popularly known as "Operation Lost Trust," an F.B.I. sting operation focusing on corruption in the South Carolina Legislature. On March 11, 1991, the defendant Gordon filed a motion for judgment of acquittal or for a new trial. On March 12, 1991, the defendant Blanding filed similar motions.

In their original motions, the Defendants sought a new trial on four grounds: jury contamination; Ron Cobb's assertion of his fifth amendment privilege; the court's denial of their motions for severance; and the length of the jury's deliberations. On April 11, 1991 a hearing was held in Columbia and the defendants' motions were heard.

At the hearing, the defendants raised the additional concern that the U.S. Attorney knew that Ron Cobb was going to be entering a plea to the drug charges which were pending against him at the time of the trial. The defendants argued, based on an article in *The Greenville News*, that the U.S. Attorney referred to Cobb's previous not guilty plea as a "procedural step toward filing of guilty pleas." Thus, the defendants argued that the U.S. Attorney knew that Cobb was going to plead the Fifth Amendment during his testimony. By pleading the Fifth Amendment, the defendants argued that their right to full cross-examination of Cobb on his prior drug use and his credibility was impaired.

A credibility issue also arose involving Cobb's testimony in a pre-trial hearing regarding drug use during a trip which he took with Richard Greer to Charleston in May 1988. In an article in the *News and Courier,* the U.S. Attorney had stated that Cobb's testimony regarding the trip to Charleston was false. The article was printed the morning of the post-trial motions. The U.S. Attorney's office stated that the only portion which was false was a reference to Greer's companion as his "girlfriend."

The court allowed the defendants more discovery in this area and a hearing was held in Charleston on May 22, 1991 at which time the defendants were allowed to examine Special Agent Michael Clemmons. Agent Clemmons confirmed that the characterization of Greer's companion as his "girlfriend" was made on a F.B.I. 302. Clemmons knew that this characterization was false and Cobb denies characterizing the companion as such to Agent Richards who prepared the 302. This ended the hearing and the defendant was given leave to supplement his memorandum.

In the interim, the U.S. Supreme Court handed down their opinion in *McCormick v. United States,* — U.S. —, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). As a result, the defendant has filed a brief requesting a new trial or judgment of acquittal on the grounds that *McCormick* requires that the jury must find a *quid pro quo* to return a guilty verdict in a Hobbs Act case. Specifically, the defendants allege that the court's charge that the jury need not find a specific *quid pro quo* was error. For the reasons set forth below, the defendants' motions are denied.

## LAW

### I. Motions for Judgment of Acquittal

The essence of the defendants' motion for judgment of acquittal is that the evidence presented did not establish that the defendants had the requisite intent to violate the Hobbs Act and that there was insufficient evidence to prove a *quid pro quo.* Mr. Gordon claims that he treated the money as a campaign contribution at all times. There was no evidence that Mr. Blanding considered the money a campaign contribution.

The standard of review for a motion under Fed.R.Crim.P. 29(c) is simply that "[t]he verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Steed,* 674 F.2d 284, 286 (4th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982).

First, it is clear that the indictment charged a *quid pro quo.* The court is well aware that the indictment is not evidence in the case. Nevertheless, the import of the indictment is that it sets forth the facts which the government must prove. As the indictment against the defendants stated:

10. It was part of said conspiracy that during the 1990 legislative session of the General Assembly defendants LARRY BLANDING and BENJAMIN J. GORDON, JR. would and did promise their support of and vote for the pari-mutuel bill in exchange for illegal payments of sums of money, as will be more full described hereinafter in this Indictment.

11. It was part of said conspiracy that during the 1990 legislative session of the General Assembly, defendant ENNIS MAURICE FANT, LARRY BLANDING AND BENJAMIN J. GORDON, JR., would and did obtain for themselves and others payments of money, for and with the consent of Ronald L. Cobb, induced under color of official right as South Carolina legislators, which payments were not legally due the defendants or their offices, and which payments were in exchange for the defendants' agreeing to sell their support of and votes for the parimutuel bill.

12. It was part of said conspiracy that during the 1990 legislative session of the General Assembly, defendant ENNIS MAURICE FANT, LARRY BLANDING AND BENJAMIN J. GORDON, JR., would and did agree to become members of a "core group" of legislators working to pass the pari-mutuel bill during the 1990 legislative session, agreed to con-

tact other legislators willing to support the pari-mutuel bill, and agreed to bring those legislators who wanted to be paid illegally in exchange for their vote and support to Ronald L. Cobb, a registered lobbyist who represented a client interested in the pari-mutuel bill then pending in the General Assembly of the State of South Carolina.

■ With the indictment setting forth the facts which the government had to prove to the jury, there appears to have been substantial evidence sufficient to find both defendants guilty. Mr. Blanding failed to report the "contributions" from Cobb on his disclosure forms, there is the requested increase in Blanding's payment and there is Mr. Blanding's false statement to the F.B.I. that he had never received a cash campaign contribution from Ron Cobb, which is amply proven in the videotapes. Finally, there are the tapes of the various meetings to support the conclusion that Mr. Blanding was voting in exchange for the money. Following a discussion of the pari-mutuel bill, the transcript of the March 7, 1991 meeting between Cobb and Blanding reads as follows:

Blanding: You know Ron, go ahead and count me in.
Cobb: Yes sir, You're a good man, what can I do for you?
Blanding: Well, I don't know.
Cobb: All right.
Blanding: I don't know. Well, what can you do for me?
Cobb: Well my stuff comes down Larry, I can, I get hits.
Blanding: Uh huh.
Cobb: Like, if you'd like maybe five hundred.
Blanding: Uh huh.
Cobb: To get it out of the Rules Committee, you help us there, I can come back with another pop.
Blanding: Uh huh.
Cobb: We get out of the House.
Blanding: Uh huh.
Cobb: Then I can come back with a good pop.
Blanding: Okay.

Cobb: Something like that'll work?
Blanding: That's fine.

Following this discussion, Mr. Blanding requested an increase in the payment from $500 to $1000. As the March 8, 1991 tape clearly shows, Mr. Blanding was paid the $1,000. Assuming that Mr. Blanding was even entitled to a *quid pro quo* charge under *McCormick, see* discussion *infra,* there is overwhelming evidence upon which the jury could have found that Mr. Blanding received the money in exchange for the official act of supporting the pari-mutuel bill.

■ Admittedly, the evidence against Mr. Gordon is not as strong as that against Mr. Blanding. There are the inferences which may be drawn from Taylor's "warning" of his core group to stay away from Cobb, Mr. Gordon's denial to the newspaper reporter, Tony Barteleme, that Gordon and Cobb never discussed pari-mutuel because Cobb knew that Mr. Gordon would not have anything to do with parimutuel betting and the tapes which directly contradict these assertions.

Finally, we focus on the damaging videotapes. The tape of March 7, 1990 shows Gordon and Cobb meeting at the AT & T building where Gordon and Cobb are speaking about the progress which Cobb would like to see on pari-mutuel. When Cobb asks Gordon what he can do for him, Gordon replies "anything that's feasible." After this remark, Cobb engages in a conversation similar to the conversation with Mr. Blanding regarding the manner in which he gets paid and how that can be passed on to the legislators. Mr. Gordon, like Mr. Blanding, acknowledges that "hits" will be received at each phase in the progression of the legislation. *See infra* pp. 271–272.

The tape of March 8, 1991 shows the payment to Mr. Gordon by Mr. Cobb. The defense asserts that Mr. Cobb did not give Mr. Gordon the opportunity to discuss the payment which allegedly would have revealed that Mr. Gordon viewed the payment as a campaign contribution. Yet, the jury heard this argument at trial and in view of the evidence mentioned above rejected it.

■ Unlike Mr. Blanding, Mr. Gordon did file Mr. Cobb's payments on his campaign disclosure form, which creates at least the inference that he viewed the payments as campaign contributions. Trial Ex. 5. Nevertheless, as discussed *infra*, even if the money were a campaign contribution, the guidelines of *McCormick* are clear that campaign contributions can violate the Hobbs Act when they are associated with a *quid pro quo* and there was sufficient evidence in this case for the jury to make such a finding. Therefore, the motions of the defendants for a judgment of acquittal are denied.

## II. The Motions for a New Trial

Fed.R.Crim.P. 33 provides that the trial judge may grant a new trial when it serves the interest of justice. As stated above the defendants have set forth four grounds, in addition to the erroneous jury charge under *McCormick*, which they feel warrant a new trial.[1]

■ In general, "the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *U.S. v. Indelicato*, 611 F.2d 376 (1st Cir.1979); *United States v. Page*, 828 F.2d 1476 (10th Cir.), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). There are numerous grounds upon which a motion for a new trial may be based. In general, errors committed at trial are judged by the harmless error standard. This applies to constitutional errors as well as errors of state law, federal statutes or rules. *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92

L.Ed.2d 460 (1986); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The defendants' original four grounds for a new trial have been judged using this standard.[2]

Under the harmless error standard, the trial judge must determine if the error was harmless beyond a reasonable doubt, i.e., whether the evidence complained of might have contributed to the conviction." *Id.* In addition, when the motion attacks the weight of the evidence, as does the defendants' fourth ground,

> the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence. In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses. When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial.

*United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir.1985).

With these standards in mind, we turn to the defendants' arguments.

### 1. *Jury Contamination*

First, the defendants argue that the trial court erred when it failed to grant a mistrial upon learning that five of the jurors had been "contaminated." Briefly, on the morning of March 6, 1991, the jurors sent a note to the court informing the judge of conduct which they had observed by two men who had been spectators at the trial

---

1. To clarify the record, the defendants never pursued any grounds for relief which may have come from the supplemental, post-trial discovery of the United States Attorney's comments to *The Greenville News*. The United States Attorney's comments regarding the falsity of Cobb's testimony about the trip which he and Dick Greer took to Charleston and the alleged "girlfriend" certainly gave this court concern. Nevertheless, as the supplemental discovery revealed, the characterization of Mr. Greer's companion as his girlfriend was made by Agent Richards, who prepared the F.B.I. 302, and not by Ron Cobb. Thus, even assuming that inquiry into this area on cross-examination would have

been allowed, the testimony would not have weighed on Mr. Cobb's credibility. As stated more fully below, the cross-examination of Mr. Cobb was extensive and counsel was given wide latitude. Counsel for the defense was certainly aware of the trip to Charleston and was free to attempt to question Mr. Cobb about it at trial, which he elected not to do.

2. As will be discussed *infra*, an allegedly erroneous jury charge, which is the defendants' fifth ground for a new trial, is determined by the "clear", or "plain", error standard when an objection to the charge has not been raised at trial.

on the previous day. Five of the jurors had observed the men pointing and making gestures at them. The men subsequently were seen speaking with the defendant Gordon.

At the request of the government and the defendant, the judge conducted an individual *voir dire* of the jurors to check for any potential bias and to determine what action should be taken. Each juror stated that they could still give the defendant a fair trial and the court concluded that the incident had not contaminated the jury.

█ The granting of a new trial because of outside contacts with the jury is left largely to the discretion of the trial court. *United States v. Albert*, 595 F.2d 283, 290 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979). As the Supreme Court stated in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982), "due process does not require a new trial every time a juror has been placed in a potentially compromising position." "The remedy for allegations of jury partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 945 *citing United States v. Remmer*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The court undertook such a hearing in this case.

The defendants point to the case of *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir.), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1988), for several propositions of law. In *Stockton*, several jurors, who were determining the sentence for the defendant in a murder trial, were approached at lunch by the owner of the restaurant where they were eating. The restaurant owner told them that he thought "they ought to fry the son of a bitch."

The court held that

in a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial ... The presumption is

not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id.* at 743 *quoting Remmer*, 74 S.Ct. at 451.

The holding of the court is nevertheless ambiguous. Although the court states that a rebuttable presumption of prejudice attaches to an impermissible communication, *Id.* at 744, the court continued on and stated

Thus, jury verdicts are not to be lightly casted[sic] aside. Our system of criminal justice rests in large measure upon a confidence in conscientious juror deliberations and juror attentiveness, both to the evidence at trial and to the instructions of the trial judge. This confidence is not to be displaced every time a third party communication reaches the ears of a juror during trial. Thus, while a presumption of prejudice attaches to an impermissible communication, *the presumption is not one to be casually invoked.*

*Id.* at 744–745 (emphasis added).

█ Based on the foregoing, it is the opinion of the court that the critical distinction which the court drew in *Stockton* was a difference between those instances when the presumption is invoked and those when it is not. A statement as vehement as the one in *Stockton* made in front of jurors who the declarant knew were deciding upon the sentence to be meted out certainly is a situation in which the presumption should be invoked. We do not believe, however, that the mere finger pointing and "obnoxious" behavior exhibited by the members of the gallery in this case warrants such a presumption if for no other reason than it fails to rise to the level of a communication.[3] Even if the presumption is allowed, the facts of this case do not warrant a new trial based on the contamination of the jury.

---

3. Obviously if someone gestured to a juror in a manner which suggested that their life was in danger the presumption would be different, but nothing like that is suggested by this case.

264

Several cases indicate that the "communication" with the jury in this case does not rise to a level which would justify a new trial. First, in *United States v. Aiello,* 771 F.2d 621 (2d Cir.1985), the defendants were convicted of several narcotics violations. During the course of the trial one of the jurors received a telephone call. The voice asked her if she was serving on the jury and stated that he wanted to help an unnamed friend. The juror reported the incident to the F.B.I. As she was leaving her home the next day she was approached by a man with the same voice and was asked if she was Natalie. The juror immediately drove off and she and another juror told their story to the judge. *Id.* at 626.

After the discussion with the jurors, the judge held a hearing with counsel and, over the objection of the defense, conducted an individual *voir dire* of each juror out of the presence of counsel. *Id.* The defense was allowed to submit questions to the judge to be asked of the witnesses. Only the other juror who had accompanied the "tainted" juror to the judge's chambers knew of the incident. The juror in question stated that she could give a fair hearing provided she was sequestered. After sequestering the jury, the judge denied the defendants motion for a mistrial.

The trial court's actions were upheld on appeal. The appellate court noted, however, that the only error which the judge made was his failure to record the initial conversations with the juror when she came to him. Nonetheless, this was held to be harmless error. The appellate court gave the trial judge's decision great deference as well as the statements of the jurors that they believed that they could render an impartial verdict. As the court stated, "one who is trying as an honest man to live up to the sanctity of his oath [as a juror] is well qualified to say whether he has an unbiased mind in a certain matter." *Id.* at 630 *quoting Dennis v. United States,* 339 U.S. 162, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950).

The other case which is instructive is cited by the government and is *United States v. Fafowora,* 865 F.2d 360 (D.C.Cir.),

*cert. denied,* 493 U.S. 829, 110 S.Ct. 98, 107 L.Ed.2d 62 (1989). In *Fafowora,* a juror was approached on the way home by a gentleman that she had seen speaking with the defendant. The gentleman said that he would give anything for information on the jury deliberation. Thus, the scenario is somewhat similar to the situation presented in this case. In *Fafowora,* the judge conducted an individual *voir dire* and probed each juror for any indication of bias. The judge subsequently denied the defendant's motion to excuse the juror. On appeal, the court upheld the jury's guilty verdict, denied the motion for a new trial and praised the court for its thorough *voir dire* of the jurors.

These cases are instructive because they show the degree of tampering which can be permitted. In this case, the "tampering" was in no way equivalent to the tampering which was apparent in *Aiello, Fafowora* nor in *Stockton.* Further, it is clear from *Aiello* that a juror's opinion that they can render an impartial verdict is entitled to great deference if the trial judge is of the opinion that they are being faithful to their oath. Finally, the individual *voir dire* conducted by this court is the preferred method for ascertaining the juror's potential bias.

It is clear that several of the jurors knew of the fingerpointing. Nevertheless, none of them gave any indication that their observations would prevent them from rendering an impartial verdict. The defendants make much of the juror's statement that they "think" or "believe" that they can reach an impartial verdict as some kind of indication of doubt. There is no doubt in the court's mind that these jurors were faithful to their oath. The quote from *Dennis v. United States,* 70 S.Ct. at 523, cited above regarding the juror's ability to determine her bias is persuasive and rebuts the defendants' argument.

As for some of the other quotes which the defendant uses, they state that Juror 10 stated that "two of the ladies on the jury felt intimidated by the incident." The full quote is "I heard two of the ladies mention that they felt a little intimidated—

or maybe that wasn't the word they used. But there were being observed for some—a little bit more so than normal." Transcript at 59, 1. 17.

The defendants further state that Juror 6, although it is clear from the transcript that they mean Juror 7, when asked by the court if anything had happened during the trial that would keep him from giving the defendant and the government a fair and impartial trial, repled, "yes, sir." Although this discrepancy was apparently missed at the time of the hearing, we are convinced that his response of "yes sir" was simply a misunderstanding of the question. The entire discourse with the juror indicates that he was not aware of what was going on and had not even had any discussions about the incident with any of the jurors. Having conducted the *voir dire* it is apparent that he thought he was asked if he could still carry out the responsibilities of his oath. *See* Transcript at p. 46. Therefore, the defendants' motion for a new trial on the grounds of jury contamination should be dismissed.

### 2. *Cobb's Assertion of the Fifth Amendment*

■ The defendants' second ground for a new trial is that the trial court erred when it allowed Ron Cobb to testify knowing that he would assert his Fifth Amendment privilege. At trial, Ron Cobb testified on a number of matters but asserted his Fifth Amendment right not to testify regarding two incidents of drug use on which he had been indicted. Neither incident occurred on a day involving events to which Cobb testified, although both incidents occurred while Cobb was working for the F.B.I.

The defendants maintain that their right to effectively cross-examine Cobb was impermissible limited by his assertion of his fifth amendment rights. As a result, Cobb should not have been allowed to testify at all.

As support for their case, the defendants point to several cases. The first case they cite to is *United States v. Crawford,* 707 F.2d 447 (10th Cir.1983) which stands for

the proposition that neither party may call a witness knowing that the witness will assert his Fifth Amendment privilege. While this is certainly true, the analogy to this case is inapposite because in *Crawford,* the witnesses were refusing to testify at all, which was not the case here.

The defendants also present the case of *Lawson v. Murray,* 837 F.2d 653, 655 (4th Cir.), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988), for the proposition that "when a prosecution witness cuts off cross-examination by invoking the fifth amendment privilege against self-incrimination, the criminal defendant's constitutional right of confrontation is directly implicated." Yet, in *Lawson,* the testimony was stricken because the witness refused to answer questions which involved the very incident that was the focus of the trial. In this case, the questions put to Mr. Cobb were on purely collateral matters and the Fourth Circuit does not require the striking of testimony of a witness whose assertion of the privilege does not frustrate the defense's ability to elicit the full facts of the instant case. *United States v. Smith,* 342 F.2d 525, 527 (4th Cir.), *cert. denied,* 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965); *Ellis v. Black,* 732 F.2d 650, 656 (8th Cir.1984) (sixth amendment not violated when inquiry is into purely collateral, not substantive, matters).

Finally, in *United States v. Summers,* 598 F.2d 450 (5th Cir.1979), the court stated that "[w]here the witness whom the accused seeks to cross examine is the 'star' government witness, providing an essential link in the prosecution's case, the importance of full cross examination to disclose possible bias is necessarily increased...." The critical inquiry in *Summers,* however, was whether "(1) the jury, through the cross examination permitted, was exposed to facts sufficient for it to draw inferences relating to the reliability of the witness; and, (2) the cross-examination conducted by defense counsel enabled him to make a record from which he could argue why the witness might have been biased." *Id.* at 461.

The cross-examination of Cobb certainly met the standards set forth in *Summers*. As the court stated in *United States v. Tindle*, 808 F.2d 319, 328 (4th Cir.1986), *cert. denied*, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989), in denying a similar motion, "[t]he jury already heard ample evidence about a life laced with crime, deceit and drug use ... a reasonable juror, having heard all of [the witness's] testimony on cross-examination, inevitably viewed [the witness's] direct testimony with skepticism, even without hearing about a possible sentence of life without parole." Such is the case here. The defense thoroughly probed Cobb's drug use and his failure to meet the terms of his plea agreement with the government. Cobb's refusal to testify about the two incidents for which he was under indictment could only have furthered the jury's skepticism about the quality of his direct testimony. Thus, the decision to allow Cobb to testify with the knowledge that he would assert his fifth amendment privilege was not error. Even if the decision were error, the holding of the court in *Tindle* indicates that the error would be harmless.

### 3. *Failure to Separate the Trials*

■ The third ground for a new trial is the trial court's failure to grant the defendants' motion for severance. In *United States v. LaRouche*, 896 F.2d 815, 831 (4th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990), the court stated

> The trial court must weigh the inconvenience and expense to the government and witnesses of separate trials against the prejudice to the defendants inherent in a joint trial, and its determination will not be disturbed unless the denial of a severance motion deprives the movant of a fair trial and results in a miscarriage of justice. The movant must show something more than merely a better chance of acquittal and must overcome the burden imposed by a stringent standard of review. We have also made clear that curative instructions given to the jury by the district court go a long way in elimi-

nating any prejudice resulting from the spillover effects of joinder.

*Id.* (citations omitted).

The defendants have made absolutely no showing whatsoever that there was any prejudice as a result of the joinder of the trials. At best, the defendants have made vague references to a spillover effect with the evidence. As the court noted in *LaRouche*, "[r]ule 8 permits joinder of offenses if they are similar in character, are based on the same act or transaction or series of transactions, or constitute parts of a 'common scheme.'" *Id.* at 830.

The cases against these defendants certainly fall into these categories. Further, the jury was specifically instructed that "the case of each defendant should be considered separately and individually ... The fact that you may find one or more of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant." Charge at p. 18, 1.4. Therefore, the movants have not demonstrated that they were, in any way, deprived of a fair trial, or that a miscarriage of justice occurred by the failure to separate these cases.

### 4. *Failure of the Jury to Follow the Instructions*

■ As their fourth ground for a new trial, the defendants allege that the jury failed to follow the instructions of the trial court to review all the evidence in the case because the jury only deliberated for ninety minutes. The defendants cite no case law for the proposition that the jury deliberated too quickly. As the court stated in *Segars v. Atlantic C.L.R. Co.*, 286 F.2d 767, 770 (4th Cir.1961), "[w]e know of no rule of law which prescribes how long a jury should be required to deliberate before returning its verdict ... [T]he verdict should be the result of conscientious deliberation, but the fact that the verdict was returned within a few minutes does not necessarily show that the jury disregarded this duty, and is not sufficient of itself to justify a new trial."

Although *Segars* arose in the context of a civil suit, the logic would be applicable to

a criminal trial as well. The jury clearly came out to view one of the videotapes. The fact that they took their responsibility seriously is evidenced in the note which they wrote to the court concerning the fingerpointing incident. There is no indication that the jury failed to consider the evidence put before them and the evidence put before them, viewed in the light most favorable to the government, was substantial enough to find the defendants guilty.

### 5. Erroneous Jury Charge

The defendants' final ground for a new trial is that the court erroneously instructed the jury that there need be no specific *quid pro quo* to establish extortion under color of official right as required under the Supreme Court's recent ruling in *McCormick*. First, we must determine the appropriate standard of review.

#### a. The standard of review

The decision before us is whether to apply the "harmless error" or "clear" error analysis. As will be set forth more fully below, the defendants' motion must fail under either standard.

■■■ The issue of an allegedly erroneous jury instruction may not be raised if the defendant did not object or propose alternative instructions at trial, *United States v. Bryant*, 612 F.2d 799, 803 (4th Cir.1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1855, 64 L.Ed.2d 274 (1980), unless the court's failure to properly instruct was clear error within the meaning of Fed. R.Crim.P. 52(b). *United States v. McCaskill*, 676 F.2d 995, 1001 (4th Cir.), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982).[4]

■■ In this case, the *quid pro quo* charge was requested *by the defendants*. *See* Defendant's requested charge at p. 146, 1.10. Further, no objection to the *quid pro quo* charge was raised at trial. Thus, this case is a classic instance of a defendant who has not preserved his right to appeal an erroneous jury instruction, provided the charge was not clear error. As a result, we believe that this motion should be analyzed using the clear or plain error standard. In an abundance of caution, however, we have also analyzed the motion using the harmless error standard.

In determining if the charge was clear, or plain, error the court must determine if the error seriously affects the "fairness, integrity, or public reputation of the judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). The courts should exercise this discretion only in exceptional circumstances, *id.*, and the weight of the evidence against the defendant is relevant to the court's inquiry. *United States v. Giese*, 597 F.2d 1170, 1199 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). As the Fourth Circuit stated in *McCaskill*, clear error can only be found when

> after reviewing the entire record, it can be said the claimed error is a '*fundamental*' error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' or where error is

---

4. The confusion as to the appropriate standard arises from the Supreme Court's decision in *McCormick*. Although McCormick had not objected to the charge at trial, both the Appellate Court and the Supreme Court addressed the issue of the erroneous charge. Thus, the majority seemed to ignore the different standards of review in reaching their decision. *McCormick*, 111 S.Ct. 1807, 1820–21, 1825 (Stevens, J., dissenting).

Despite the majority's diffidence over Fed. R.Crim.P. 30 in *McCormick*, we cannot accept the proposition that the Supreme Court has unilaterally disposed of Fed.R.Crim.P. 30, especially in a case in which the defendant himself has requested the erroneous charge. Rather, the reason that the majority in McCormick addressed the issue of the charge was apparently that McCormick had raised the issue on appeal and the Appellate opinion had addressed his assertion in its opinion even though he had not raised the objection at trial. Since the issue had been addressed, rightly or wrongly, at the appellate court level, the majority felt that it was proper for the Supreme Court to address the issue as well. *McCormick*, 111 S.Ct. at 1815, n. 9.

such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' or where it can be fairly said 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.'

*McCaskill*, 676 F.2d at 1002 (emphasis in original) (citations omitted).

 Under the harmless error standard, the trial judge must determine if the error, considering the record as a whole, was harmless beyond a reasonable doubt. *Rose v. Clark*, 478 U.S. 570, 583, 106 S.Ct. 3101, 3109, 92 L.Ed.2d 460 (1986).[5] In *Pope v. Illinois*, 481 U.S. 497, 502, 107 S.Ct. 1918, 1921–22, 95 L.Ed.2d 439 (1987), the Court elaborated on the *Rose* decision and stated that "in the absence of error that renders a trial fundamentally unfair, such as denial of the right to counsel or trial before a financially interested judge, a conviction should be affirmed '[w]here a reviewing court can find that the record developed at trial established guilt beyond a reasonable doubt....' "

*Pope* is directly on point because the issue was whether the trial court's misdescription of an element of the offense justified a new trial and the Supreme Court held that it did not. The inquiry is whether based on the facts found by the jury, it is clear beyond a reasonable doubt the jury's verdict would have been the same even if they had never heard the impermissible instruction. *Id.* at 503, n. 6, 107 S.Ct. at 1922 n. 6. Stated another way, an error is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828; *Yates v. Evatt*, 111 S.Ct. 1884, 1892 (1991).

As will be developed more fully below and viewing the record as a whole, the jury's verdict indicates that they found, as a factual matter, that the money was not a campaign contribution and that a *quid pro quo* existed.

### b. McCormick

At the outset it is important to distinguish the facts of *McCormick* from the facts of this case. The cases are similar in that they involve cash payments to legislators and McCormick, although he did not report the monies as campaign contributions, maintained at trial that they were contributions. *McCormick* is slightly different, however, in that the defendant *specifically* referred to the expense of his campaign prior to receiving the money from the lobbyist. In this case, any belief that the monies were considered campaign contributions must be inferred by the defendants' conduct because neither of the defendants were as explicit as Mr. McCormick about the "purpose" of the money.

The primary concern expressed by the majority opinion in *McCormick* is the breadth of the seven factor test to distinguish legitimate from illegitimate campaign contributions as well as the "voluntariness" of such contributions. The majority was clearly concerned that the Appellate Court's formulation for distinguishing contributions was too general and could encompass numerous legitimate political contributions. *McCormick*, 111 S.Ct. at 1816.

Further, the majority expressed a concern that the instructions were susceptible to an interpretation under which a contribution was involuntary if it was made with *any* expectation of benefit. The Supreme Court recognized, and common sense dictates, that most if not all campaign contributions are given with a general expecta-

---

**5.** Justice Scalia wrote a concurrence in *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) which, it has been argued, lessens the standard set forth in *Rose*. This argument has been rejected by the Fourth Circuit, *Waye v. Townley*, 884 F.2d 762, 764 (4th Cir.1989). Further, Justice Scalia's concurrence addresses the harmless error standard only as it is applied in assessing an improper mandatory conclusive presumption charge. *Carella*, 109 S.Ct. at 2421. Thus, Justice Scalia's concur- rence is inapplicable to a case such as this which involves a misstatement as to an element of the offense. This case presents the usual case of harmlessness which requires consideration of the record as a whole. *Id.* Similarly, the subsequent refinement of Justice Scalia's concurrence in *Yates v. Evatt,* —— U.S. ——, —— n. 8, 111 S.Ct. 1884, 1892 n. 8, 114 L.Ed.2d 432 (1991) is inapplicable, although those portions of the opinion which address the usual harmlessness analysis are instructive.

tion of benefit. As a result, the most significant aspect of the opinion is that a finding of a specific *quid pro quo*, rather than a general expectation of benefit, is necessary for a violation of the Hobbs Act when the defendant claims that the money was a campaign contribution.

Political contributions are of course vulnerable if induced by use of force, violence or fear. The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within in the meaning of the Hobbs Act.

This formulation defines the forbidden zone of conduct with sufficient clarity. *McCormick*, 111 S.Ct. at 1816.

This is the extent of the guidance which the majority gives us on the *quid pro quo* that is necessary for a violation of the Hobbs Act. The holding of *McCormick* is certainly limited. The opinion does not address any jurisdictional issues, although it is apparently assumed that McCormick's actions would have affected, or did affect, interstate commerce, nor the necessity of an "inducement" by the official, nor does it address the requirements of the Hobbs Act vis a vis travel, meals, gifts or other articles of value. *Id.* at 1817, n. 10.

At least the following are clear from the *McCormick* decision:

1) The intent of the parties is a relevant consideration.

2) A *quid pro quo* instruction is required when the defendant alleges that the monies were campaign contributions. *Id.* at 1817, n. 10.

#### c. Analysis

■ Under either the clear error or harmless error standard, the defendants' motions must fail. Under the clear or plain error standard, we do not feel that the charge taken in the context of the entire charge and evidence as a whole amounts to a miscarriage of justice. Consistent with *McCaskill*, 676 F.2d at 1002, the defendants received a fair trial with the assistance of very capable counsel and, as set forth below, we cannot say that the instruction had a probable impact on the jury's verdict. The findings of the jury regarding the legitimacy of the monies given to the defendants make it clear that the charge had no impact on the jury's verdict.

Two questions aid in the harmless error analysis. First, is the evidence sufficient to establish that the monies could have been considered campaign contributions, which would justify a *quid pro quo* charge? Second, if a *quid pro quo* charge should have been given, does the jury charge, taken as a whole and when coupled with the verdict, allow the court to find beyond a reasonable doubt that the jury found that the defendant offered his support in exchange for the payments, i.e., that a *quid pro quo* existed and the erroneous charge was harmless? The jury's findings on intent are clearly important in this regard.

1. *Is the evidence sufficient to establish that the monies could have been considered campaign contributions, which would justify a quid pro quo charge?*

The *McCormick* decision is clear that the defendant must claim that the money was a campaign contribution to receive a *quid pro quo* charge. 111 S.Ct. at 1817, n. 10. Otherwise, if the money is not a campaign contribution, the money is not due and owing to the official, which violates the statute. *United States v. Paschall*, 772 F.2d 68, 73 (4th Cir.1985), *cert. denied*, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986).

The holding is also clear that even political contributions are vulnerable under the act if the payments are made in return for an explicit promise or undertaking. *Id.* The implication is that less legitimate forms of payment are certainly vulnerable under the act which may not require proof of a *quid pro quo* since the danger of convicting a defendant of an otherwise le-

gal activity is not present. Thus, the inquiry becomes whether or not there was sufficient evidence to establish that the monies were campaign contributions. Although neither defendant offered any evidence, the government's own evidence can raise a defense or a reasonable doubt sufficient to warrant an instruction. *United States v. Hicks*, 748 F.2d 854, 857 (4th Cir.1984).

 In the case of Mr. Blanding, there is absolutely no evidence that the money was a campaign contribution nor that he claimed the monies were campaign contributions. Mr. Blanding did not make any reference to the monies as a campaign contribution nor did he report the monies on his campaign disclosure forms. Further, when questioned by the F.B.I. about receiving cash campaign contributions, Mr. Blanding specifically denied ever receiving any cash campaign contributions or knowing anyone who was giving cash campaign contributions. Thus, Mr. Blanding was not entitled to a charge that the jury must find a specific *quid pro quo*.

 Mr. Gordon's case is different. As mentioned above, although the date is incorrect, Mr. Gordon did file a disclosure form listing the monies from Cobb. Further, when questioned by the F.B.I., he did acknowledge receipt of the monies, although the story he related to the F.B.I. was not consistent with the tapes that were presented. Therefore, there was sufficient evidence for Mr. Gordon to have received a *quid pro quo* charge.

2. *If a quid pro quo charge should have been given, does the jury charge, taken as a whole and when coupled with the verdict, allow the court to find beyond a reasonable doubt that the jury found that the defendant offered his support in exchange for the payments?*

Assuming, *arguendo* in the case of Mr. Blanding, that both defendants were entitled to a specific *quid pro quo* charge, does the error warrant a new trial?

 First, we must examine the charge as a whole. *United States v. Silva*, 745 F.2d 840, 852 (4th Cir.1984); *United States v. Park*, 421 U.S. 658, 671, 95 S.Ct. 1903, 1911, 44 L.Ed.2d 489 (1975). The instructions make it clear that the jury had to find that the monies were *not* campaign contributions to find the defendant guilty:

> Under our system of government, the law authorizes elected officials to solicit campaign contributions. The Hobbs Act, under which the Defendants have been charged, does not punish an elected official for accepting campaign contributions. *If you find that the defendants accepted the money from Ron Cobb reasonably believing that the money was a legitimate campaign contribution, you must acquit the Defendants on all counts in the indictment.* (emphasis added)

Charge at p. 35, 1. 9.

It is a well established presumption that "jurors are reasonable and generally follow the instructions they are given," and there are no indications to the contrary in this case. *Evatt*, 111 S.Ct. at 1893. Thus, the jury had to consider evidence as to whether the monies were or were not campaign contributions. Admittedly, "legitimate" is not defined with any precision; yet, the problem in *McCormick* was that the court had attempted to define "legitimate" with too much precision. If the definition of "reasonable doubt" is left to the collective and individual wisdom of the jury, *United States v. Headspeth*, 852 F.2d 753, 755 (4th Cir.1988), then certainly they are capable of differentiating between a "legitimate" and "illegitimate" campaign contribution. As the *McCormick* case demonstrated, too precise a definition can lead to unnecessary confusion.

If the monies were not campaign contributions, and the jury clearly indicated they were not, then the money was not due and owing the defendant and the receipt of the money was in violation of the Hobbs Act. *Paschall*, 772 F.2d at 73. Further, since the jury found that the monies were not legitimate campaign contributions, the finding of a *quid pro quo* was not required,

*McCormick,* 111 S.Ct. at 1817, and the inclusion of the charge in this case was harmless error. Finally, the charge given in this case gave the defendant a greater chance for acquittal than the charge suggested by the *McCormick* case because this charge mandated a not guilty verdict if the jury found that the monies were campaign contributions whereas *McCormick* requires a guilty verdict if a campaign contribution is associated with a specific *quid pro quo.*

■ The record is also sufficient to establish guilt beyond a reasonable doubt even if a *quid pro quo* is required. It is not contested that the defendants supported parimutuel, or that Ron Cobb paid them money, the only dispute is the defendant's contention, or intent, that the money was a campaign contribution. The charge specifically stated that "to find a defendant guilty of attempt to commit extortion under color of official right, you must be convinced beyond a reasonable doubt that at the time payments were made to the defendants, he was aware that the payments were intended to influence his official conduct." Charge at 25, 1. 6. If the payments were made with this awareness and the intent to support pari-mutuel, as the jury clearly found, then a *quid pro quo* was established. In contract terms, there is an offer, an acceptance and consideration.

Viewing the record as a whole, there was substantial evidence to support the jury's finding of a *quid pro quo.* As stated before, there is absolutely no evidence in Mr. Blanding's case that the money was a campaign contribution in the first place. At best, counsel for Mr. Blanding argued that "uh-huh" was not enough of an affirmative response to find assent. We are not persuaded by this argument.

The tapes are clear as to the agreement between Mr. Cobb and Mr. Blanding. Further, Mr. Blanding's request for an increase in the payment is especially damaging in this regard as it indicates that he reconsidered the value of his support for pari-mutuel and the implicit threat that he would not support the bill if the increased payment was not made. In the case of Mr. Blanding, the government presented sufficient and probative evidence of a *quid pro quo* and there is no probative evidence to the contrary.

As for Mr. Gordon, although his disclosure of the money on the ethics forms is certainly probative of his belief that the money was a campaign contribution, it is not as probative as to whether or not there was a *quid pro quo.* The taped meetings between Mr. Gordon and Mr. Cobb are more probative on the issue of a *quid pro quo.* The March 7, 1990 tape reads as follows:

COBB: B.J., Luther had mentioned that uh, ya'll had a discussion.

GORDON: Yeah.

COBB: I represent a pari-mutuel, some people in pari-mutuel interests.

GORDON: Uh huh.

COBB: Uh, they're with investors that are heavy hitters, we're gettin' ready to make a move on the Rules Committee.

GORDON: Marchin'.

COBB: To uh get a, tryin' to get it set for right after filing.

GORDON: Uh huh.

COBB: And just, I need your help.

GORDON: I'm open. I'm open.

COBB: I need your help baby.

GORDON: Alright.

COBB: And cause my people are, they're serious, they feel like this is, this is the time to do it, and I'm the man here for them and I'm ready.

GORDON: It's an attraction the state ought to have.

COBB: You got it.

GORDON: Yeah.

COBB: I'd like to have a little piece of one of 'em too.

GORDON: Yeah.

COBB: I'm prepared to do whatever I need to do.

GORDON: Exactly. Then do it. Then do it.

COBB: Now, what can I do for you?

GORDON: Anything that's feasible. (Both laugh)

COBB: Man, you tough. Man you tough. The way they're doin' me B.J. is if we make progress, I get pops, 'course gettin' it out of Rules Committee is, you know, that's a pop. If, if, would it be reasonable if, say I came up with a thousand now, and then when, when I get another pop.

GORDON: Uh huh.

COBB: We can, uh, we can do some more.

GORDON: Okay.

COBB: Would that uh.

GORDON: Yeah.

COBB: Would that work?

GORDON: Yeah, it'll work.

COBB: I need your help on Rules baby.

GORDON: Yeah, okay, that'll be fine.

The probativeness of this tape on the issue of the *quid pro quo* is clear and unmistakable. Further, there is Mr. Gordon's later statement to the reporter, Tony Barteleme, that Cobb knew that he would have nothing to do with pari-mutuel which is directly contradicted by the conversation on March 7, 1991 and Mr. Gordon's acceptance of the money. Under the instructions, the jury had to consider this evidence as it related to the legitimacy of the "campaign contribution." Having considered this evidence, there can be no other conclusion except that Mr. Cobb was going to give Mr. Gordon $1,000 for his support of the pari-mutuel bill in violation of the Hobbs Act. Therefore, we can say beyond a reasonable doubt that record establishes the defendants guilt and the erroneous instruction did not contribute to the verdict obtained.

In conclusion, the defendant's motion should be denied. First, to the extent that they have not preserved their right to appeal, the charge is not plain error. Consistent with *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101 (1986), the defendants received a fair trial with the assistance of very capable counsel. The findings of the jury regarding the legitimacy of the monies given to the defendants make it clear that the charge had no impact on the jury's verdict.

Second, Defendant Blanding was not entitled to a *quid pro quo* charge since there was absolutely no evidence that he viewed the monies as campaign contributions.

Third, assuming that a harmless error standard applies, the inclusion of the charge was harmless inasmuch as the jury clearly found that the monies were not legitimate campaign contributions, which obviates the requirement of a specific *quid pro quo*. *McCormick*, 111 S.Ct. at 1817. In addition, the record establishes guilt beyond a reasonable doubt even if a specific *quid pro quo* charge was required. As stated above, the jury clearly found that the defendants accepted the monies knowing that they were intended to influence their official conduct and that they were not campaign contributions. Therefore, the inclusion of the erroneous charge was harmless.

Pursuant to *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101 (1986) and *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918 (1987), we believe that the record establishes guilt beyond a reasonable doubt, that the erroneous charge had no impact on the verdict and that the jury's verdict should be affirmed. Based on the foregoing it is

ORDERED, that the motions of the defendants be, and the same are hereby, denied.

AND IT IS SO ORDERED.